(Decided 19th December, 1884.)

---

ANDREW J. TABLER *vs.* JOHN H. TABLER, GEORGE F. TABLER, and others.

*Incomplete Will of Personalty—Caveat—Second set of Issues.*

A man in a dying condition undertook to dictate his will to an amanuensis, and while this dictation was *in progress*, his mind gave way before he had time to complete what he evidently deemed an important part of it. HELD:

That while the authorities had gone very far in admitting unfinished or incomplete papers as good wills of personal property, no Maryland decision had gone to the extent of holding that in such a case, the part of the instrument which he dictated while in possession of his mental faculties, could be set up as his will.

On a caveat to a paper writing purporting to be a will of personalty, issues were granted by the Orphans' Court, raising the question of the testamentary capacity of the deceased as affecting the entire

paper. These issues were tried before a jury who found adversely to the will. Before the Orphans' Court had acted on this verdict, by refusing probate of the instrument, one of the original caveatees applied for a second set of issues to try the question, whether the instrument was not good down to the last clause, but void as to that clause by reason of the mind of the deceased having suddenly given way before said clause was written, or the instrument was signed. On appeal from the refusal of the Orphans' Court to grant said issues, it was HELD:

1st. That assuming this new set of issues could have been granted if they had been applied for at the proper time, it was too late to ask for them after a trial and verdict on the first set.

2nd. That the appellant had knowledge, or means of knowledge in his possession, of all the facts and circumstances upon which his application was founded, at the time the first issues were granted, and should then have obtained the issues subsequently asked for, if they could have been granted at all.

It is only in cases where the issues are totally different throughout, that successive sets of them can be allowed, and successive trials had.

If the question of capacity is once raised on a caveat to a paper purporting to be a will, the issues must be so framed *in the first instance* as to present it, so far as the law will permit, in every aspect, and with reference to every part of the paper which the circumstances demand or the parties desire.

APPEAL from the Orphans' Court of Montgomery County.

The case is stated in the opinion of the Court.

The cause was argued before ALVEY, C. J., STONE, MILLER, ROBINSON, IRVING, and RITCHIE, J.

*Thomas Anderson,* and *Wm. P. Maulsby, Jr.,* for the appellant.

If the testator were of sound and disposing mind, memory and understanding at the time he dictated said will, down to clause five thereof, and the will, dictated as aforesaid down to said clause, disposed of his entire es-

tate, and was intended by him to operate as his will, then it was a valid will of personal property, and the testamentary intention could not be defeated by the scrivener writing other clauses to the will after the testator had so lost consciousness, and without his dictation or direction. *Weems vs. Weems, et al.,* 19 *Md.,* 343 *and* 347; *Boofter vs. Rogers,* 9 *Gill,* 44; *Dorsey's Testamentary Law,* 61; *In re Welsh,* 1 *Redfield's Surrogate Reports,* (*New York,*) 238; *Redfield's American Cases on the Law of Wills,* 513, 514; *Munnikhuysen vs. Magraw,* 35 *Md.,* 280.

If the issues sent to the Circuit Court for trial required the jury to pass upon the paper as an entirety, and did not permit them to exclude by their verdict the portion thereof written by the scrivener after the testator had lost consciousness, and pass upon the residue thereof, then under the circumstances of this case the appellant is entitled to have new issues framed and sent to said Court, so that the jury may pass upon the validity of said paper as a will, down to clause five. *Pegg, et al. vs. Warford,* 4 *Md.,* 390, 393; *Diffenderffer and Hungerford vs. Griffith and Griffith, Executors,* 57 *Md.,* 81 *and* 87.

The only way the appellant could have the will down to clause five, appointing an executor, passed upon by the jury, was to apply to the Orphans' Court for new issues, since the Circuit Court had no power to modify the issues sent to it by the Orphans' Court for trial, or to direct a qualified finding upon them by the jury, and if the jury had found for the appellant on those issues, they would have found for the paper as an entirety, and part of the judgment of the Orphans' Court on such finding would have been the grant of letters testamentary to the appellant; consequently the appellant could not have reversed, by appeal to this Court, the rulings of the Circuit Court rejecting his instructions, asking that a portion of said paper-writing be submitted to the jury. *Cook vs. Carr and*

*Wife,* 20 *Md.,* 403, 410; *Griffith vs. Diffenderffer, et al.,* 50 *Md.,* 466, 489.

*James McSherry,* and *James B. Henderson,* for the appellees.

MILLER, J., delivered the opinion of the Court.

This appeal is from an order of the Orphans' Court refusing to grant a second set of issues involving the validity of a will, and it presents a singular and novel question.

A paper-writing, purporting to be the last will of Michael Leather, was propounded for probate. The name of the alleged testator was signed by Warner Welsh, the scrivener who prepared the instrument. It is also duly attested by three witnesses, but as all the estate of the deceased consisted of personal property, this attestation was, as the law then stood, unnecessary. It contains five clauses. In each of the *three first* there is a legacy of $2000 to a named legatee. The *fourth* is the residuary clause disposing of all the rest and residue of his estate, and the *fifth* appoints Andrew J. Tabler his executor, and revokes all former wills.

A caveat was filed and, after the usual proceedings, five issues were sent to a Court of law for trial. Of these the *first* is, was this instrument sufficiently executed to pass personal property? the *second* were its "contents" read to or by the alleged testator, or known by him "at or before the time of the alleged execution thereof?" the *third,* was it his last will and testament? the *fourth,* was he "at the time of the alleged execution" thereof of sound and disposing mind, capable of executing a valid deed or contract? and the *fifth,* was its execution procured by undue influence or fraud? At the trial the verdict was for the caveator on all the issues except the last. In other words the jury found, upon all the testimony before them, and under instructions as to the law (which the re-

Tabler *vs.* Tabler, *et al.*

cord shows the Court gave) that this instrument was *not* sufficiently executed to pass personal property, that its contents were *not* read to or by the deceased, or known by him at or before the time of its alleged execution, that it was *not* his last will and testament, and that at the time of its alleged execution he did *not* have testamentary capacity. No exceptions to the rulings of the Court appear to have been taken, nor was any appeal prosecuted; but a motion for a new trial, upon the ground that the verdict was against the evidence and the instructions of the Court, was overruled, and the Court ordered the verdict to be certified to the Orphans' Court.

Before the Orphans' Court had acted on this verdict, by refusing probate of the instrument, one of the original caveatees, (the party named as executor therein) filed a petition in that Court asking for five new issues substantially as follows: 1st. Was this paper-writing down to its fifth clause (which appoints the executor and revokes former wills) sufficiently executed to pass personal property? 2nd. Were its contents down to said clause, read to or by the deceased, or known by him at the time of the writing thereof? 3rd. Is it down to said clause the last will and testament of the deceased? 4th. Was the deceased at the time of the writing of said paper down to its fifth clause, of sound and disposing mind, memory, and understanding, and capable of executing a valid deed or contract? 5th. Was he, at the time of the writing of said paper down to its said fifth clause "prevented by sudden and extreme illness from proceeding further with said paper-writing, said extreme illness thus incapacitating him, continuing to the time of his death?"

The grounds stated in the petition upon which these new issues are asked, are, that the first issues presented the instrument as an entirety, and required each fact to be found or negatived as of the whole paper; that Welsh, the scrivener, in his testimony at the trial of the first

issues, testified that he wrote or read over to the deceased each and every clause in this instrument down to the fifth, and that this fifth clause was not read to him, nor was the same directed to be so written by him, nor was it made known to him at or before the execution of the paper; and that further evidence was also offered tending to show that the deceased was seized with extreme illness immediately before this fifth clause was written, and that at no time thereafter until his death, did he regain sufficient strength and capacity to enable him to finish his said will beyond that clause, and that he did not dictate the writing of that clause, but the whole of it was copied by Welsh from *Latrobe's Justice* without any suggestion from the deceased. The petition then avers that this is a good will to pass personal property, even though this last clause was not read to, or made known to the deceased, if he was prevented by the act of God, or sudden illness from completing the instrument in the way he had designed. To this petition the original caveator, together with other next of kin of the deceased, filed an answer in which they admit that Welsh testified as stated, and also that there was testimony of like effect, as to the time the incapacitating illness supervened, but they aver there was other testimony submitted to the jury tending to prove that the deceased was taken ill the *day before* this paper was written, and that early in the morning of the day it was prepared, and from that time on, was incapable of making a valid deed or contract, and was in that condition of incapacity *before* Welsh was sent for, and *before* the alleged dictation commenced, and so continued until his death. The respondents then resist the granting of these new issues upon the ground that the same facts, in substance and in truth, were involved in the former issues and were conclusively adjudicated under those issues, and the interpretation placed upon them by the Court in the instructions which it gave, and which appear in the record.

Upon this petition and answer the Orphans' Court passed an order refusing to grant the new issues and dismissing the petition. From this order the petitioner has appealed.

We do not know what the entire testimony before the jury on the trial of the first issues really was. We can gather some of it from the averments of this petition and answer, and from the instructions granted can infer there was more. One of these instructions, granted at the request of the caveatees, is to the effect that if the jury find, from all the evidence, that Welsh wrote the introductory clause of the alleged will and read it to the said Leather, and that he then dictated all the clauses disposing of his estate, including the residuary clause, and that Welsh wrote the same as so dictated, and that Leather was then asked who he wanted as executor, and replied " Jack, Jack, Jack," and that this was the usual mode by which he designated Andrew J. Tabler, then the instrument was sufficiently made known to him to be a good will to pass personal property, and the verdict must be for the caveatees under the second and third issues, even though the jury should further find that that part of the fifth and last clause which revokes former wills, was not dictated by or read or made known to the said Leather, *provided* they shall further find that he was, at the time of said dictation, of sound mind, memory, and understanding, and capable of making a valid deed or contract. Now, upon the presumption that the Court would not have granted this instruction unless there was evidence tending to support every hypothesis of fact it contained, the inference is a legitimate one that the deceased not only intended to appoint an executor, in order to complete his will, but named the party he wished to act in that capacity.

From this meagre disclosure of the testimony it is impossible to say, with certainty, upon what ground the verdict was based. It is highly probable the jury found

that incapacity existed before the preparation of the paper was begun, and we are strongly inclined to the opinion that, under the instructions given them, such must be the legal intendment of their verdict. It is possible, however they may have found that the deceased was incapable up to the time of the preparation of the last clause, but became incapable before the executor was named, and may have thought that upon the issues before them, and the instructions of the Court, they were bound to find against the will unless they believed he was competent when the appointment of the executor was written, and it may be inferred from the rejected instructions that the Court was of that opinion. But assuming the jury did so find, their verdict must be conclusive, at least, that incapacity supervened before the executor was appointed, and, that being so, it is by no means certain that the disposing clauses, even if dictated and written while capacity lasted, could be admitted to probate, especially if there was any evidence that it was his purpose to appoint an executor. Such appointment, though not essential to its validity, is still an important part of a will, and few are made without it. The compensation which our law allows an executor is liberal, and this, where the estate is large or considerable, (as was the case here) is usually taken into consideration by a testator and forms part of his testamentary scheme ; and from the granted instruction already referred to, we infer there was evidence offered by the appellant himself tending to show that the alleged testator in this case intended to appoint an executor in order to complete his will. No doubt the authorities have gone very far in admitting unfinished or incomplete papers as good wills of personal property ; but here we have a case where a man in a dying condition undertakes to dictate his will to an amanuensis, and while this dictation is *in progress* his mind gives way before he has time to complete what he evidently deemed an important part of it. We have found no Maryland decision

which has gone to the extent of holding that in such a state of case, the part of the instrument which he dictated while in possession of his mental faculties can be set up as his will. The case differs materially from those of *Weems vs. Weems, et al.*, 19 *Md.*, 334, and *Barnes vs. Crouch*, reported in *Dorsey's Testamentary Law*, 60. In the former, the original record shows that the paper propounded for probate was a complete will disposing of all the testator's property, and appointing an executor. The Court found from the proof that the testator was capable of making a valid will *during all the time* he was giving the verbal instructions for the preparation of this paper, and only became incapable later in the day when it was presented to him for formal execution; and they pronounced it a good will of personalty. In the other case, the terms "my executor hereinafter named," appear in the formal commencement of the will, but it is manifest they were simply copied by the scrivener from the form he was using. There is no proof whatever from any of the witnesses that the testator gave any instructions as to the appointment of an executor, or ever expressed a wish to have one, and the paper contains no such appointnent. Here also the proof was clear that the testatator was of sound mind *during the time* he gave the instructions, and that he gave all he intended to give; but some time afterwards, when the paper was brought to him to be signed, he was speechless and dying. The order of the Orphans' Court admitting the paper to probate appears to have been affirmed by the Court of Appeals in June, 1834, but no opinion was filed stating the reasons for the affirmance. It is plain, however, that it was not a case where the mind failed and incapacity came on while the dictation or giving of instructions was in progress and before it was completed.

Still more does the present case differ from that of *Boofter vs. Rogers*, 9 *Gill*, 44. In that case instructions or memoranda for an entire will, including the appoint-

ment of an executor, were prepared by the testator him-self at a time when there was no question as to his capacity, and these he left with a scrivener with directions to prepare a formal will in accordance therewith. The testator died some months afterwards, but before the formal will was prepared and executed, and the Court held that such a paper could be admitted to probate, if the more formal will was left unfinished by any act which the law pronounces to be the act of God, provided it is shown that the intention of the deceased that it should be his will continued down to the time when the act of God intervened. There are also several other cases in which the same doctrine has been announced, and this, as it seems to us, is the extent to which the Maryland decisions have gone. Among the earlier decisions of the English Ecclesiastical Courts, cases can be found which sustain the position that *so much* of this paper as was dictated while the deceased was of sound mind could be admitted to probate. *Billinghurst vs. Vickers,* 1 *Phillimore,* (*Ecclesiastical,*) *R.,* 67; *Wood vs. Wood, Ibid.,* 357; *Nathan vs. Morse,* 3 *Phill.,* 529. But in the later case of *Montefiore vs. Montefiore,* 2 *Addams,* 354, it was charged that the paper set up as a will of personalty was dictated by the testator, when he was of sound mind, though suffering from great weakness, and that he became incapable of fully executing it. According to this paper, the testator after giving a farm to each of his two sons, gave " *all his other property to his wife.*" The Court, however, under all the circumstances of the case, refused to admit it to probate, and, Sir JOHN NICHOLL, in the course of his opinion, refused his assent to the proposition contended for by one of the counsel, that if a testator dies while the instrument is in progress, that instrument *as far as it goes,* be its contents and effect what they may, must be valid. In 1 *Jarman on Wills,* (2nd *Amer. Ed.*) 137, the learned author states the general proposition to the effect, that the doctrine in favor

of imperfect papers obtains only where the defect is in regard to some formal or authenticating act, and not where it applies to the contents of the instrument; for, if in its actual state, the paper contains only a partial disclosure of the testamentary scheme of the deceased, it necessarily fails of effect, even though its completion was prevented by circumstances beyond his control; and 'he then refers to this case of *Montefiore vs. Montefiore,* as sustaining the position, that where a person while dictating his will to an amanuensis is stopped by sudden death, or the rapid declension of his mental or physical powers, such paper cannot be admitted to probate as containing his entire will, without the most unequivocal testimony that the deceased considered it as finished; and the fact that the paper professes to dispose of the deceased's whole estate is not conclusive as to its completeness, because testators not unfrequently begin with such a universal disposition, and then proceed to bequeath specific portions of their property by way of exception thereout.

It would thus seem at least doubtful whether, assuming the proof to be exactly as the record shows he insists it is, the appellant could ever have succeeded in having any part of this paper admitted to probate. But it is not necessary to express a definite opinion either upon this question or upon the question whether the verdict on the first issues must be taken as a conclusive finding by the jury that there was an entire want of capacity during all the time the paper was in course of preparation, nor to rest the decision of the case upon either of these points. There is another ground upon which we think the order appealed from, must be affirmed, and that is, assuming this new set of issues could have been granted if they had been applied for at the proper time, it is too late to ask for them now after a trial and verdict on the first set. The caveat attacked the testamentary capacity of the deceased, and asked for issues submitting that question to a jury. The

appellant was not only a party to that proceeding but was named as executor in the alleged will. When he consented to the first set of issues he knew they raised the question of capacity, and he also knew that at the trial he would be called on to defend the paper from assault on that ground. If he desired to raise the question whether capacity lasted down to the dictation and writing of the fifth clause, and then ceased, then was the time to raise it. The issues now asked could then have been granted, in connection with the other issues, if they could be granted at all, and no excuse is given in his present petition for not asking them then. He does not aver that he was taken by surprise by the testimony which Welsh gave at the trial, or that he did not know at the time the caveat was filed, or could not, by the use of ordinary diligence, have learned what the facts in relation to the condition of the deceased and his dictation of this paper were, and what the testimony of the party who acted as scrivener in its preparation would be; and in fact we do not see how he could have truthfully made any such averment. He was the custodian of the paper, and in his affidavit before the register when he brought it to the Orphans' Court, he states that he received it from the deceased the very day it purports to have been executed. When it was thus produced in Court and opened to his inspection, if not before, he knew who the attesting witnesses and scrivener were, and the slightest inquiry of them, would have given him information of all the facts and circumstances upon which his present application is founded. With this knowledge or means of knowledge in his possession, he consented to let the original issues go without even the suggestion of any such addition or modification as he now seeks through the instrumentality of a new set of issues. From this it would seem that his purpose was to take the chance under the first issues of sustaining before the first jury the whole will, in which, if he was successful, he

would secure the office of executor ; and if he did not succeed in that, then to fall back upon the four clauses which contain the legacies, and of which he and his son receive the larger share, and submit the validity of these to a second jury under a new or modified set of issues. In our opinion there is no law, precedent, or authority which sanctions such a proceeding.

In the case of *Pegg vs. Warford,* 4 *Md.*, 385, our predecessors have very clearly construed the several sections of our testamentary law which relate to the awarding and trial of issues, and with equal clearness have declared the effects of verdicts thereunder, and how far such verdicts are binding or conclusive upon the Orphans' Courts. In the opinion in that case, which is often quoted, it is laid down that it does not necessarily follow, that the finding of the jury negatively or affirmatively upon the questions submitted by the issues, determines the validity of the paper as a will, because there may be other facts outside of the verdict, and not inconsistent with it which decide the question ; and hence it follows, that even after the finding of a jury on issues, other issues in regard to facts not covered by those pronounced upon may be sent, if the final judgment on the paper has not been rendered, so that the Orphans' Court have not only the right, but are sometimes bound to render their final judgment on the findings of different juries upon different issues. And what is thus meant by " different issues," they take pains to illustrate in this wise :—" thus if an issue be sent to a Court of law which involves only the question of the execution, attestation and publication of the paper, and it be found in favor of the paper, it is still competent to the same party, or any other in interest, to require another issue or issues as to the mental and disposing capacity of the testator, or the exercise of undue importunity or control over him, the practice of fraud upon him, or any other fact not inconsistent with the execution, attestation and publication of the paper."

It is plain that in the instance thus put, there can be no possible clashing between the several findings, for neither the same facts *nor any part of the same facts* are submitted by the different issues to the different juries. It is only in rare cases like this where the issues are totally different throughout, that successive sets of them can be allowed, and successive trials had. We find nothing in any of the language used in this carefully prepared opinion of our predecessors, which countenances the idea that they intended to say that a set of issues raising the question of *capacity* as to a *whole* paper could be tried, and then be followed by another set, raising the *same* question as to a *part* of the *same* paper, to be tried before another jury; and we are clearly of opinion that if the question of capacity is once raised in a case like the present, the issues must be so framed *in the first instance* as to present it, so far as the law will permit, in every aspect and with reference to every part of the paper which the circumstances demand or the parties desire. There ought not to be successive sets of issues involving that question and successive trials of it. The practical effect of allowing these new issues to be sent would be little short of granting the appellant a new trial; for the first jury may have found, and, (as we have said,) probably did find upon the evidence before them that incapacity existed before the preparation of the paper was commenced, whereas another jury upon the same evidence may be convinced that it intervened only after the first four clauses had been written, so that he may, upon the same evidence, get a verdict from the second jury, which he could not have obtained from the first. For these reasons we shall affirm the order of the Orphans' Court.

It is satisfactory to know that no question like the present, nor any similar one, can arise under any will executed since the 1st of August, 1884. Nearly seventy years ago Judge MARTIN in delivering his opinion in the

Tabler *vs.* Tabler, *et al.*

important case of *Tilghman vs. Stewart,* (4 *H. & J.,* 165,) said it was much to be regretted that the requisites to constitute a will of personal property were not the same as those required for a will of real estate. The Legislature has, at last, heeded this suggestion, and by the Act of 1884, ch. 293, has placed wills of real and personal estate on the same footing by requiring them to be written, signed and attested in the same manner.

*Order affirmed, and*
*cause remanded.*

(Decided 19th December, 1884.)